IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-93

No. COA20-636

Filed 6 April 2021

Onslow County, No. 16 JA 254

IN RE: S.D.

Appeal by Respondent-Mother from order entered 2 March 2020 by Judge Sarah C. Seaton in Onslow County District Court, Juvenile Division. Heard in the Court of Appeals 10 March 2021.

*Christina Freeman Pearsall for Guardian ad Litem.*

*Mercedes O. Chut for Respondent-Appellant.*

WOOD, Judge.

¶ 1    Respondent-Mother appeals a permanency planning order which granted guardianship of Sawyer[1] to his foster parents and terminated further review hearings. We reverse and remand.

## I.    Background

¶ 2    On September 30, 2016, the Onslow County Department of Social Services ("DSS") filed a petition alleging Sawyer and his two siblings, Laura and Susan, were

---

[1] *See* N.C. R. App. P. 42(b) (pseudonyms are used to protect the identity of the juveniles).

neglected and dependent juveniles.  Laura was 10 years old; Susan was 5 years old; and Sawyer was 4 years old at the time the petition was filed.  On the same day, the trial court granted DSS nonsecure custody of the three minor children.

¶ 3   At the adjudication and disposition hearing on March 13, 2017, Respondent-Mother did not contest an adjudication of dependency.  The trial court found Respondent-Mother had a history of homelessness and was residing in a motel with the children at the time the petition was filed.  The social worker observed dog feces on the floor, and the room smelled of feces and urine.  The motel room was cluttered. The children were unbathed and had recently been treated for a lice infestation.  DSS supplied basic personal care items for the children, such as toothbrushes and hairbrushes.  At the time, Susan had been belatedly enrolled in school, and Laura had missed more than ten days.  The children were not current on their immunizations.  Laura had been prescribed medication; however, Respondent-Mother was "unable to ensure medication compliance."  The trial court had concerns that Respondent-Mother had unaddressed mental health issues and parenting deficits.

¶ 4   The trial court noted Sawyer was considered "delayed."  When Sawyer entered foster care, he had a vocabulary of 6 words and was not potty-trained.  Laura and

Susan were placed in a foster home together.[2]  DSS placed Sawyer in a separate, therapeutic foster home where he began counseling and speech therapy through Coastal Carolina Neuropsychiatric Center.

¶ 5        The trial court ordered Respondent-Mother to enter into and comply with a case plan.  This plan required Respondent-Mother to obtain and maintain appropriate housing and employment, and to participate in a psychological evaluation and comply with recommendations.

¶ 6        The first permanency planning hearing occurred on June 9, 2017.  At that time, the primary permanent plan of care was reunification with a secondary plan of adoption.  Respondent-Mother was homeless and unemployed.  Following a request by DSS and prior to the hearing, Respondent-Mother completed a forensic psychological evaluation in May 2017.  Respondent-Mother was diagnosed with "Other Specified Personality Disorder – significant Borderline, Narcissistic, Histrionic, and Paranoid Traits."

¶ 7        On December 21, 2017, a second permanency planning hearing occurred.  Sawyer remained in his therapeutic foster home.  He was successfully potty-trained, and his vocabulary had expanded.  Sawyer was attending kindergarten and continuing speech therapy.  He was diagnosed with and prescribed medication for

---

[2] Reunification remains the primary permanent plan for Laura and Susan's primary permanent plans.  Therefore, they are not the subjects of this appeal.

attention-deficit/hyperactivity disorder ("ADHD").

¶ 8 On October 9, 2017, DSS brought a motion before the trial court requesting Respondent-Mother's visitation be suspended until she "compl[ied] with the recommendations of her psychological evaluation" as required by her case plan. The trial court granted this motion.

¶ 9 The trial court found Respondent-Mother completed a psychiatric diagnostic evaluation on October 19, 2017. She was diagnosed with Major Depressive Disorder and post-traumatic stress disorder ("PTSD"). On October 23, 2017, Respondent-Mother saw Dr. Gary Whitlock at Port Human Services, and he prescribed medication to treat a diagnosis of Bipolar II disorder. However, Respondent-Mother discontinued the medication because she experienced side effects. Respondent-Mother continued to be homeless and unemployed. The permanent plan was changed to adoption with a secondary plan of reunification at the December 21, 2017, permanency planning hearing. Supervised visitation for a minimum of two hours per month was reinstated after the trial court found Respondent-Mother had "compl[ied] with the recommendations of her psychological evaluation." Respondent-Mother's visitation was supervised by DSS.

¶ 10 The third permanency planning hearing occurred on May 24, 2018. The trial court found that Respondent-Mother had completed Triple P and Active series parenting classes at PEERS. The trial court further found that Respondent-Mother

missed her medication management appointments in January 2018. Despite several referrals from DSS, Respondent-Mother reported difficulty securing appointments due to the loss of her Tricare insurance after her divorce. Respondent-Mother reported new employment at that time.

¶ 11        On November 7, 2018, the trial court held the fourth permanency planning hearing where the Guardian *ad Litem* reported that Respondent-Mother's residence status had changed due to Hurricane Florence from her staying in a home in Hubert, to being in the process of signing a rental agreement for a rent-to-own home. Respondent-Mother reported to the trial court that she was leasing to own a home, had purchased a car, and had attended therapy sessions twice per month since June 2018. Respondent-Mother provided proof of employment. The trial court found that Respondent-Mother actively participated in her case plan. For the first time, the court found that it was likely that the children could be returned to Respondent-Mother's care within the next six months. The permanent plan was changed to a primary plan of reunification with a secondary plan of adoption.

¶ 12        The Guardian *ad Litem* also reported Sawyer was to repeat kindergarten in the upcoming school year. Sawyer was able to "complete a full night's sleep, bath [sic] himself, and still needs assistance from a speech program" though the Guardian *ad Litem* reported Sawyer's communication had improved.

¶ 13        On February 11, 2019, the trial court held the fifth permanency planning

hearing where it found Respondent-Mother was no longer living in the house but was renting a room elsewhere. Respondent-Mother remained on the waiting list for the Family Unification Program Referral. Respondent-Mother remained employed and continued therapy. The therapist reported that Respondent-Mother had made "tiny steps towards progress." The trial court noted visitation had increased in January 2019 to include a third supervised visit per month, supervised by Sawyer's foster mother ("Ms. S"). The primary permanent plan remained reunification, and the court found reunification was likely within the next six months.

¶ 14 At the July 10, 2019 permanency planning hearing, the trial court found that Respondent-Mother attended biweekly therapy appointments and participated in family therapy with her children one to two times per month, as required by her case plan.

¶ 15 On September 11, 2019, the trial court held the next permanency planning hearing and found that although Respondent-Mother's therapist discharged her, she felt she needed "additional support" and continued therapy on her own. Family therapy continued, as required by Respondent-Mother's case plan, and Respondent-Mother remained employed with the same employer. The court found Sawyer would require therapeutically guided transition assistance should he return to Respondent-Mother's care. The court also found that Sawyer was receiving multiple services, including speech therapy and medication management for his ADHD. He was fully

potty-trained but had "urine and fecal accidents with varying frequency." The court granted unsupervised visitation with all three children, beginning on August 2, 2019.

¶ 16   At the December 2, 2019 permanency planning hearing, the trial court found that Respondent-Mother had complied with her case plan by maintaining stable employment and regularly attending therapy. However, Respondent-Mother had not completed the final step in her case plan of securing safe and consistent housing for the children. Respondent-Mother enjoyed two four-hour unsupervised visitations per month with an additional two-hour visitation supervised by DSS in September 2019 and October 2019.

¶ 17   The trial court considered Emily Sinning Sewell's ("Ms. Sewell"), Sawyer's therapist's, November 19, 2019 letter in which she stated that Sawyer was diagnosed with ADHD, Combined Type, Phonological Disorder and Rule Out Anxiety Disorder. The trial court found that Sawyer was diagnosed with chronic constipation with encopresis and was "on a fairly strict treatment regimen that includes weekly cleanses, Miralax, mineral oil and fiber gummies every day." Sawyer had to maintain a healthy diet and a rigid toileting schedule. Sawyer's doctor reported that his condition would likely continue until his teenage years and potentially for life; and if not properly treated and monitored, his condition could be fatal.

¶ 18   After hearing the testimony of the DSS social worker and considering other evidence, the trial court found reunification unlikely "due to [Respondent-Mother's]

continued reluctance to accept housing assistance offered to her." The trial court acknowledged a letter dated October 3, 2019, from DSS to Eastern Carolina Human Services Agency ("ECHSA"), requesting that Respondent-Mother's position on the wait list for housing assistance be reconsidered, and Respondent-Mother had met with an ECHSA representative in November 2019. The trial court also found that the primary barriers to achieving the permanent plan of reunification were Respondent-Mother's failure to obtain and maintain stable housing, Sawyer's "continued anxious symptoms related to discussions of returning home," and Respondent-Mother's lack of understanding of Sawyer's diagnosis. The primary permanency plan was changed to guardianship with a secondary plan of reunification.

¶ 19      At the final permanency planning review hearing on January 31, 2020, the social worker, Respondent-Mother, Ms. S, and the Guardian *ad Litem* testified. The trial court took notice of the existing juvenile record and received into evidence DSS' and the Guardian *ad Litem's* court reports. The trial court found that Respondent-Mother maintained employment, as required by her case plan. Respondent-Mother resumed therapy after being discharged due to a misunderstanding. She maintained contact with DSS and her children. Respondent-Mother continued to lack safe and consistent housing despite several referrals and other supports that have been put in place by DSS. The social worker testified DSS provided various services to

Respondent-Mother. DSS referred her to various housing agencies, which included financial assistance of $1,300.00 to help with deposits; provided a list of potential available homes; and provided a community social service assistance for several weeks the previous summer. The social worker further testified that Respondent-Mother preferred not to live in some housing that was available to her due to its poor condition in the wake of Hurricane Florence. Respondent-Mother testified that she looked at approximately eighty potential housing possibilities over the course of the case. Respondent-Mother stated she was unsuccessful at securing stable housing due to several factors, including her credit score and the unavailability of rental homes. Respondent-Mother also testified she was looking into three potential rentals on the date of the hearing, but she had not yet seen any of the three potential rentals.

¶ 20 Respondent-Mother testified that she occasionally stayed with friends, rented rooms, or spent the night in a hotel. The trial court found Respondent-Mother had opportunities for housing but declined to stay in the housing available to her. Specifically, the trial court noted that

> [s]everal referrals and other supports have been put in place to attempt to aid [Respondent-Mother] in this process without success. [Respondent-Mother] has opportunities for housing; however, she does not wish to stay in the housing available to her . . . . [Respondent-Mother] stated that she stays with friends, rents rooms occasionally, and spends the night in hotels.

At the time of the hearing, Sawyer was in the first grade. The trial court found he

was behind academically and had delays and speech issues. Sawyer saw his gastroenterologist every other month, had special dietary needs, and was on a regimen of medications. The trial court found Respondent-Mother did not understand Sawyer's special medical and dietary needs. The trial court also found that Respondent-Mother had begun unsupervised visitations on August 2, 2019. Since the visits began, she arrived late and brought the children home early on several occasions.

¶ 21    Ms. S testified that Sawyer had lived in her home since October 3, 2016. She testified if she were granted guardianship and the foster care subsidies were no longer paid, she would still be able to take care of Sawyer legally, financially, mentally, and emotionally and that she would do so indefinitely.

¶ 22    Ms. Foster, Sawyer's social worker, testified Sawyer enjoyed visiting with his mother and siblings, but he was bonded with his foster family. Sawyer expressed a desire to be with them long-term.

¶ 23    The trial court ultimately entered its order, granting guardianship of Sawyer to his foster parents. The trial court found guardianship to be in Sawyer's best interest. In its order, the trial court made the following findings of fact:

> 5. [D]espite the progress she has made, [Respondent-Mother] has still failed to remedy the housing situation that brought her children into care. She continues to lack consistent, safe housing that could support her three children. Several referrals and other supports have been

put in place to attempt to aid [Respondent-Mother] in this process without success. [Respondent-Mother] has had opportunities for housing; however, she does not wish to stay in the housing available to her.

. . .

10. The Department has continued to assist [Respondent-Mother] in finding housing by referring [Respondent-Mother] for a housing voucher, working with [Respondent-Mother] and CSSA to maintain and apply for housing, and [Respondent-Mother] currently has a referral in to East Carolina Human services for housing. The Department continues to assist [Respondent-Mother] in attempting to find suitable and appropriate housing.

. . .

13. It is contrary to the juvenile's welfare and best interest to return to the home of the respondent parent at this time and it is not likely to take place within the next six months, due to [Respondent-Mother's] continued reluctance to accept housing assistance offered to her.

The trial court further found that the primary permanent plan of guardianship had been achieved and, accordingly, ordered that all further review hearings cease. Respondent-Mother timely appealed.

## II. Standards of Review

This Court "reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to

disposition." *In re C.M.*, 183 N.C. App. 207, 213, 644 S.E.2d 588, 594 (2007) (citations omitted); *In re D.A.*, 258 N.C. App. 247, 249, 811 S.E.2d 729, 731 (2018). A trial court's findings of fact are "conclusive on appeal when supported by any competent evidence, even if the evidence could sustain contrary findings." *Matter of Norris*, 65 N.C. App. 269, 275, 310 S.E.2d 25, 29 (1983).

"An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." *In re N.G.*, 186 N.C. App. 1, 10–11, 650 S.E.2d 45, 51 (2007) (citation and internal quotation marks omitted), *aff'd per curiam*, 362 N.C. 229, 657 S.E.2d 355 (2008).

The determination of parental unfitness or whether parental conduct is inconsistent with the parents' constitutionally protected status is reviewed *de novo*. *In re D.A.*, 258 N.C. App. at 249, 811 S.E.2d at 731. Under *de novo* review, the appellate court "considers the matter anew and freely substitutes judgment for that of the lower tribunal." *Id.* (alterations, citations and internal quotations omitted).

## III.  Analysis

Respondent-Mother raises several arguments on appeal. Each will be addressed in turn.

### A. Lack of Competent Evidence for Trial Court's Findings

#### 1. *Respondent-Mother's Lack of Housing*

Respondent-Mother first contends the trial court's findings that Respondent-

Mother rejected opportunities for adequate housing and that her lack of housing is volitional are not supported by competent evidence. We agree.

¶ 30 The trial court's findings of fact suggest that DSS provided meaningful assistance that produced real housing opportunities for Respondent-Mother and that she turned down suitable housing. We find no evidence to support that characterization.

¶ 31 In this case, Respondent-Mother had two avenues to obtain housing. First, Respondent-Mother could work with the family reunification program ("FUP")—part of Section 8 housing—or she could get assistance in paying a rental deposit up to $1,300.00. However, there was a three-year waiting list for Section 8 housing. That is why Ms. Foster did not recommend that Respondent-Mother go through Section 8 and the family reunification program to obtain housing.

¶ 32 The second avenue required Respondent-Mother to find housing on her own. DSS gave Respondent-Mother a list of potentially available houses through "Eastern Carolina or other agencies"; however, Ms. Foster never identified the "other agencies." She identified "Eastern Carolina" as "Eastern Carolina Human Services," which is "another branch of the Section 8 housing/FUP." Assuming Ms. Foster's "other agencies" were independent of Section 8, Ms. Foster could not say whether the houses or apartments on that list were available and met the needs of Respondent-Mother and her children. She admitted that she never checked. Ms. Foster only

knew that Respondent-Mother told her the houses on the DSS list had occupants or were not in good repair. When asked how many homes Respondent-Mother supposedly turned down, Ms. Foster admitted, "I'm not sure."

¶ 33 Respondent-Mother explained that she had looked at approximately eighty residences without success. Because of Hurricane Florence, there was a shortage of rental housing in Onslow County. With her low credit score, Respondent-Mother could not qualify for rental housing in that competitive market. Ms. Foster agreed that Hurricane Florence severely impacted the housing market.

¶ 34 Indeed, in the letter Ms. Foster wrote to Eastern Carolina Services Agency on October 3, 2019, to request review of Respondent-Mother's housing application, she touted Respondent-Mother's "tremendous progress" and that "the children's therapists have stated that they have no current concerns about [Respondent-Mother] reunifying with her children." Ms. Foster reported that the only thing standing in the way of reunification was "a lack of safe, stable, and appropriate housing." She noted that Respondent-Mother was in a "difficult position in that she makes too much money for some types of aid but does not make enough money to comfortably afford a lot of homes that are available in the area now post-[H]urricane Florence."

¶ 35 Additionally, Respondent-Mother explained that some of the houses or apartments on the lists DSS gave her were occupied or were not in good condition.

DSS presented no evidence of what Respondent-Mother should have done if she found a residence on the list to be occupied. Ms. Foster indicated that Respondent-Mother should wait to see if the occupants moved, presumably by driving by the location from time to time. Ms. Foster never explained how Respondent-Mother could get information about when, if ever, those homes would be available. Though Respondent-Mother did knock on the door and speak to one occupant, the record contains no evidence that knocking on doors and asking occupants if they were moving would have produced positive results.

¶ 36 Respondent-Mother testified that she did not turn down one viable residence. Instead, none of the homes on the lists provided by DSS "panned out." Ms. Foster could not identify one viable residence that Respondent-Mother turned down. Ms. Foster did not refute Respondent-Mother's reports of the homes she investigated, as Ms. Foster never investigated the homes.

¶ 37 Speculation that, in general, people who earn "decent" wages should be able to find housing in the vicinity of Onslow County is not proof that Respondent-Mother could obtain adequate housing for herself and the children. There is no evidence that Respondent-Mother voluntarily declined adequate housing. The record and transcript contain no evidence that any housing support DSS offered Respondent-Mother led to an adequate residence that Respondent-Mother rejected. At best, DSS gave Respondent-Mother a list of addresses compiled by a third-party, which no

employee of DSS reviewed, directing her to the three-year waiting list with the Housing Authority. For this reason, we conclude the evidence does not support the trial court's findings of fact to the extent they state that DSS provided Respondent-Mother with practical, timely, or meaningful assistance in obtaining housing, and Respondent-Mother failed to cooperate with that assistance or rejected adequate residences.

### 2. *Respondent-Mother's Ability to Meet Sawyer's Needs*

¶ 38      Next, Respondent-Mother contends the trial court's findings that she had not learned how to meet Sawyer's needs, did not participate in therapy, and was late for visits are not supported by competent evidence. We agree.

¶ 39      Respondent-Mother's court-ordered case plan required her to obtain and maintain appropriate housing and employment, and to participate in a psychological evaluation and comply with recommendations. She obtained the psychological evaluation on May 12, 2017, and the provider recommended that Respondent-Mother participate in therapy for three to four months and then receive a psychiatric evaluation for possible medication.

¶ 40      At the June 9, 2017 permanency planning hearing, the court ordered Respondent-Mother to take parenting classes and "to demonstrate the skills learned during visits with the juveniles." On October 9, 2017, Respondent-Mother obtained a psychiatric evaluation and was prescribed psychiatric medication. At the December

21, 2017 permanency planning hearing, the court ordered Respondent-Mother to follow the recommendations of her psychological evaluation and to participate in individual and group therapy weekly, as well as satisfy the previously established reunification goals of stable housing and employment. Subsequent permanency planning orders never changed or added to those reunification requirements.

¶ 41 A close review of the initial dispositional order and subsequent orders from permanency planning hearings does not reveal any requirement from DSS or the court that Respondent-Mother attend Sawyer's medical appointments or individual therapy. Neither the orders nor the court reports mention these topics until the vague finding in the December 2, 2019 order that Respondent-Mother did not understand Sawyer's diagnosis. Additionally, Respondent-Mother asked Sawyer's foster family for the name and contact information for Sawyer's therapist and medical providers, but there is no evidence this information was provided to her.

¶ 42 On the topic of Sawyer's "needs," Ms. Foster had no first-hand knowledge of whether Respondent-Mother understood Sawyer's gastrointestinal issues. She said that the foster parents told her that Respondent-Mother gave Sawyer mozzarella sticks "several times" and "cheese tends to make him worse." She also said the foster parents reported several conversations with Respondent-Mother about Sawyer's diet.

¶ 43 The evidence is undisputed that, at the worst, Respondent-Mother gave Sawyer cheese sticks, which upset his stomach. Respondent-Mother said she had not

been told to avoid giving Sawyer cheese beforehand. At the January 31, 2020 hearing, Respondent-Mother voiced an understanding of Sawyer's medical issues and condition. The evidence does not support a finding that Respondent-Mother was unable or unwilling to provide proper care for Sawyer.

¶ 44         The trial court also found that Respondent-Mother was late to several visits and, on occasion, returned the children early. That finding, standing alone, does not accurately portray the evidence. Ms. Foster explained that Respondent-Mother was late to a few visits and had to return the children early because she was solely responsible for transporting all three children to and from unsupervised visits, and she was late because of "traffic or . . . the school pick up lines." Nothing in the record indicates that Respondent-Mother could avoid being late and returning the children early on occasion, given her transportation burden and traffic patterns.

¶ 45         Therefore, we conclude the evidence does not support the trial court's findings that Respondent-Mother had not learned how to meet Sawyer's needs, failed to participate in therapy, and was late for visits.

### 3. DSS's Reasonable Efforts

¶ 46         Next, Respondent-Mother argues the trial court's findings that DSS made reasonable efforts to reunify, and Sawyer was not likely to return home in six months, are not supported by competent evidence. We agree.

¶ 47         "Our General Assembly requires social service agencies to undertake

reasonable, not exhaustive, efforts towards reunification." *In re: A.A.S, A.A.A.T., J.A.W.*, 258 N.C. App. 422, 430, 812 S.E.2d 875, 882 (2018). "Reasonable efforts" is defined as "[t]he diligent use of preventive or reunification services by a department of social services when a juvenile's remaining at home or returning home is consistent with achieving a safe, permanent home for the juvenile within a reasonable period of time." N.C. Gen. Stat. § 7B-101(18) (2019).

¶ 48      Here, DSS attempted to reunify the family and eliminate the need for continued placement through case plan development; holding regular Child and Family Team Meetings; linking Respondent-Mother with mental health services and parenting education; confirming completion of services; facilitating visitation; and ensuring Sawyer and his sisters' medical and developmental needs were met. However, DSS did not give Respondent-Mother meaningful assistance in obtaining housing.

¶ 49      The limited assistance DSS gave Respondent-Mother in finding housing consisted of handing her an unvetted list of addresses produced by a third party and directing her to the Housing Authority with its three-year waiting list. Both suggestions proved useless.

¶ 50      Nonetheless, by January 31, 2020, Respondent-Mother had located three more potential homes and was optimistic she could rent one of them. Given Respondent-Mother's success and her prospect of obtaining housing soon, the trial court erred in

concluding DSS made reasonable efforts to reunify, and that Sawyer was unlikely to return home within six months.

### 4. *Respondent-Mother's Constitutionally Protected Parental Status*

¶ 51 Next, Respondent-Mother contends the trial court erred in failing to make findings regarding her constitutionally protected parental status. We agree. "A parent has an interest in the companionship, custody, care, and control of his or her children that is protected by the United States Constitution." *Boseman v. Jarrell*, 364 N.C. 537, 549, 704 S.E.2d 494, 502 (2010) (alterations, quotation marks, and citation omitted). This right is paramount to claims by third parties for custody of the child. *Petersen v. Rogers*, 337 N.C. 403-04, 445 S.E.2d 901, 905 (1994). "So long as a parent has this paramount interest in the custody of his or her children, a custody dispute with a nonparent regarding those children may not be determined by the application of the best interest of the child standard." *Boseman*, 364 N.C. at 549, 704 S.E.2d at 503 (citation and quotation marks omitted). However, a parent can forfeit their right to custody of their child by unfitness or acting inconsistently with their constitutionally protected status. *Id.*

¶ 52 A determination that a parent has forfeited this status must be based on clear and convincing evidence. *In re D.A.*, 258 N.C. App. at 249, 811 S.E.2d at 731; *Weideman v. Shelton*, 247 N.C. App. 875, 880, 787 S.E.2d 412, 417 (2016). The trial court must clearly address whether the parent is unfit or if their conduct has been

inconsistent with their constitutionally protected status as a parent, where the trial court considers granting custody or guardianship to a nonparent. *In re B.G.*, 197 N.C. App. 570, 574, 677 S.E.2d 549, 552 (2009); *In re A.S.*, 203 N.C. App. 140, 142, 693 S.E.2d 659, 661 (2010); *In re J.L.*, 264 N.C. App. 408, 419, 826 S.E. 258, 266 (2019).

¶ 53     Here, the trial court never found Respondent-Mother unfit or to have acted inconsistently with her constitutional right to parent her child. On the contrary, the trial court's finding "[t]hat the best interests of [Sawyer] would be served by granting [Sawyer's foster parents] guardianship" because Respondent-Mother is still "attempting to find suitable and appropriate housing" does not, by itself, prove Respondent-Mother is unfit or acted inconsistently with her constitutionally protected parental status.

### 5. *Respondent-Mother's Compliance with Reunification Efforts*

¶ 54     Next, Respondent-Mother contends the trial court erred when it ceased reunification efforts. We agree.

¶ 55     This Court reviews the order to cease reunification:

> [to] consider whether the trial court's order contains the necessary statutory findings to cease reunification efforts. Under our statutes: "Reunification shall remain a primary or secondary plan unless the court made findings under [N.C. Gen. Stat. §]. 7B-901(c) or makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b) (2017). . . . The court could only cease reunification efforts after finding that those

efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety.

*In re D.A.*, 258 N.C. App. at 253, 811 S.E.2d at 733–34.

¶ 56 "Under our statutes, reunification whenever possible is the goal of juvenile court." *In re J.M., N.M.*, ___ N.C. App. ___, 2021-NCCOA-__, ¶ 24. The trial court may cease reunification efforts only upon supported findings "that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b); *In re D.A.*, 258 N.C. App. at 253, 811 S.E.2d at 733-34; *In re K.L.*, 254 N.C. App. 269, 280, 802 S.E.2d 588, 592 (2017). In making this determination, the trial court considers

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C. Gen. Stat. § 7B-906.2(d) (2019). "The focus of this statute is on the actions of the parent[]." *In re J.M., N.M.*, ¶ 24. "While the trial court is not mandated to use the precise language of Section 7B-906.2(d), the order must embrace the substance of the statutory provisions requiring findings of fact that further reunification efforts

would be futile or inconsistent with the juvenile's health, safety, or need for a safe, permanent home within a reasonable period of time." *Id.* (citing *In re K.R.C.*, 374 N.C. 849, n.7, 845 S.E.2d 56, n.7 (2020)).

¶ 57     The findings must also "demonstrate the degree of success or failure toward reunification," including addressing the factors outlined in section 7B-906.2(d). *In re J.H.*, 373 N.C. 264, 268, 837 S.E.2d 847, 850 (2020). "The trial court's written findings must address the statutes['] concerns, but need not quote its exact language." *In re L.M.T.*, 367 N.C. 165, 168, 752 S.E.2d 453, 455 (2013). Failure to enter findings that satisfy the statutory criteria is reversible error. *Id.* The findings must logically support the court's legal conclusions. *In re Anderson*, 151 N.C. App. 94, 96, 564 S.E.2d 599, 601 (2002).

¶ 58     An order may implicitly cease reunification efforts if the order's effect is the cessation of reunification efforts. *In re A.P.W.*, 225 N.C. App. 534, 537-38, 741 S.E.2d 388, 390-91, *disc. rev. denied*, 367 N.C. 215, 747 S.E.2d 251 (2013). That the order does not expressly cease reunification efforts is irrelevant. *Id.*

¶ 59     Here, the order does not expressly cease reunification efforts between Sawyer and Respondent-Mother, but it places Sawyer in the guardianship of his foster parents and terminates further review. The order precludes the possibility that Respondent-Mother and Sawyer will be reunited.

¶ 60     The trial court failed to make the findings required by N.C. Gen. Stat. § 7B-

906.2(b) and (d) to cease reunification efforts. The trial court did not fully address any of the criteria listed in N.C. Gen. Stat. § 7B-906.2(d) in its findings of fact. The trial court found that Respondent-Mother did not make progress in finding housing, but it did not address whether her lack of progress was "adequate . . . within a reasonable period of time." N.C. Gen. Stat. § 7B-906.2(d)(1). The trial court should have evaluated Respondent-Mother's progress in securing housing in light of the evidence that Hurricane Florence made housing scarce. Respondent-Mother's credit score barred her from many rental units. Respondent-Mother made too much money to qualify for some types of aid but did not make enough to afford many of the homes available in the area after Hurricane Florence. There is no indication the trial court considered that evidence.

¶ 61 Instead, the trial court found that DSS presented adequate housing options to Respondent-Mother and she turned them down capriciously. The trial court failed to address whether Respondent-Mother was "actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile." N.C. Gen. Stat. § 7B-906.2(d)(2). The evidence shows Respondent-Mother was actively participating in her case plan and had cooperated with DSS.

¶ 62 The trial court did not address whether Respondent-Mother "remains available to the court, the department, and the guardian ad litem for the juvenile." N.C. Gen. Stat. § 7B-906.2(d)(3). All evidence indicated that Respondent-Mother was very

involved with and cooperative with all parties. Lastly, the trial court did not address whether Respondent-Mother was "acting in a manner inconsistent with the health or safety of the juvenile." N.C. Gen. Stat. § 7B-906.2(d)(4). The trial court found only that "[i]t is contrary to the juvenile's welfare and best interests to return to the home of the Respondent-Mother parent at this time."

¶ 63        The trial court did not address any criteria of N.C. Gen. Stat. § 7B-906(b). The evidence does not explain why it would be contrary to Sawyer's welfare to remain in foster care six more months to allow Respondent-Mother to try to secure housing. The trial court's failure to comply with the mandatory statutory analysis in ceasing reunification efforts, demonstrated by the entry of sufficient findings, is reversible error.

**B. The trial court erred in ceasing further review hearings.**

¶ 64        Lastly, Respondent-Mother contends the trial court erred in ceasing further review hearings. We agree. A trial court may not cease further review hearings without making the following findings of fact required by N.C. Gen. Stat. § 7B–906.1(n) (2019):

> (1) The juvenile has resided in the placement for a period of at least one year, or the juvenile has resided in the placement for at least six consecutive months when the court enters a consent order pursuant to [N.C. Gen. Stat. §] 7B-801(b1).
>
> (2) The placement is stable and continuation of the

placement is in the juvenile's best interests.

(3) Neither the juvenile's best interests nor the rights of any party require that review hearings be held every six months.

(4) All parties are aware that the matter may be brought before the court for review at any time by the filing of a motion for review or on the court's own motion.

(5) The court order has designated the relative or other suitable person as the juvenile's permanent custodian or guardian of the person.

Absent a waiver under subsection (n), Section 7B–906.1(a) requires that "subsequent permanency planning hearings shall be held at least every six months [after the initial permanency planning hearing] . . . to review the progress made in finalizing the permanent plan for the juvenile, or if necessary, to make a new permanent plan for the juvenile." *Id.* If the trial court waives these hearings, it "must make written findings of fact satisfying each of the enumerated criteria listed in N.C. Gen. Stat. § 7B–906.1(n), and its failure to do so constitutes reversible error." *In re P.A.*, 241 N.C. App. 53, 66, 772 S.E.2d 240, 249 (2015)).

Here, the trial court failed to make findings under N.C. Gen. Stat. § 7B–906.1(n). Therefore, the trial court committed reversible error and its order must be remanded. *In re R.A.H.*, 182 N.C. App. 52, 62, 641 S.E.2d 404, 410 (2007).

## IV.   Conclusion

"Reunification shall remain 'a primary or secondary plan unless the court made

findings under G.S. 7B-901(c) or G.S. 7B-906.1(d)(3), the permanent plan is or has been achieved . . . or the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety.' N.C. Gen. Stat. § 7B-906.2(b). A trial court may cease reunification efforts only when the written findings comply with N.C. Gen. Stat. §§ 7B-901(c) and 7B-906.1(d)(3)." *In re J.M., N.M.*, ¶ 55 (alterations omitted).

¶ 67        We hold the trial court's findings are unsupported by competent evidence, and its conclusion that reunification is contrary to Sawyer's health and safety is unsupported by its findings. To the contrary, the evidence demonstrated that Respondent-Mother substantially completed her case plan, with only the requirement of adequate housing remaining outstanding and which she was working to fulfill, to reunify with Sawyer. Accordingly, we reverse and remand for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Judges ZACHARY and JACKSON concur.